1                                                                          SVK

2   **WO**

3

4

5

6                   **IN THE UNITED STATES DISTRICT COURT**

7                       **FOR THE DISTRICT OF ARIZONA**

8

9   Laura Ann Rogers,                    )      No. CV 07-0195-PHX-DGC (DKD)
                                         )
10              Plaintiff,               )
                                         )
11  vs.                                  )
                                         )
12  Phoenix Police Department, et al.,   )
                                         )
13              Defendants.              )
    _____ )
14                                       )
    Laura Ann Rogers,                    )      No. CV 07-0379-PHX-DGC (DKD)
15                                       )
                Plaintiff                )      **ORDER**
16                                       )
    vs.                                  )
17                                       )
    Phoenix Memorial Hospital,           )
18                                       )
                Defendant.               )
19  _____ )

20         Plaintiff Laura Ann Rogers, who is confined in the Arizona State Prison Complex in

21  Goodyear, Arizona, filed these civil rights actions, which were consolidated under CV 07-

22  0195.  Defendants separately move for summary judgment.[1]  (Doc. #46, 48.)   The motions

23  are ready for ruling.  (Doc. ##62, 69; 72, 79.)  The Court will grant the motions and terminate

24  the action.[2]

25  _____

26         [1]The Court issued Notices pursuant to Rand v. Rowland, 154 F.3d 952, 962 (9th Cir.
    1998) *(en banc)*.  (Doc. ##50, 51.)

27

28         [2]Defendant Phoenix Memorial Hospital's request for oral argument is denied.  (Doc.
    #48.)

## I.    Background

Plaintiff's claims arise out of events occurring on October 5 and 6, 2006, when she was arrested by officers of the Phoenix Police Department and taken to Phoenix Memorial Hospital (PMH).  In Count I of the Complaint against the Phoenix Police Department, Plaintiff claimed that her Fourth Amendment rights were violated when Officer Tadsen[3] ordered the Hospital to do a "personal cavity search" on Plaintiff while she was in the emergency room; the search was done without a warrant.  In the Complaint against PMH, Plaintiff claimed that her Fourth Amendment rights were violated when she was subjected to a vaginal cavity search without her authorization, without a warrant, and without cause (Count I) and when a catheter was inserted without a warrant or probable cause (Count II). Plaintiff alleges that this was done under the direct orders of Tadsen and that PMH has a practice of following the commands of the police.

Tadsen moves for summary judgment on the grounds that (1) no warrant was required because she had a reasonable suspicion that Plaintiff had drugs concealed in her vagina, (2) the search was conducted in a reasonable manner, (3) exigent circumstances existed, and (4) she is entitled to qualified immunity.  PMH moves for summary judgment on the grounds that (1) it is not liable under § 1983 because it is not a state actor, (2) as a private entity, it is not liable to Plaintiff under § 1983, (3) if the Court finds it is a state actor, it is entitled to qualified immunity, and (4) under the Emergency Room Aid exception, it is not liable.

Plaintiff argues in her response that (1) Tadsen did not have reasonable suspicion of concealed drugs because Plaintiff did not tell officers that she had concealed drugs, ingested Valium, or wanted to kill herself; (2) the search was not conducted in a reasonable manner because there was no warrant and the search was done by a nurse, not a doctor; (3) no exigent circumstances existed for the search; and (4) Tadsen is not entitled to qualified immunity.  As to the PMH, Plaintiff argues that (1) it is a state actor because Tadsen and PMH worked as a team, (2) it is not entitled to qualified immunity because Plaintiff told the

---

[3]Tadsen is the only remaining Defendant in CV 07-0195, and she is now known as Jamie Jesty.  (Doc. #47, Ex. 6, Jesty Aff. ¶ 2.)

1   nurse that Plaintiff did not want the search and that they needed a warrant, and (3) no exigent
2   circumstances existed.

3   **II.    Motion for Summary Judgment**

4         **A.    Legal Standards**

5               **1.    Summary Judgment**

6        A court must grant summary judgment if the pleadings and supporting documents,
7   viewed in the light most favorable to the non-moving party, "show that there is no genuine
8   issue as to any material fact and that the movant is entitled to judgment as a matter of law."
9   Fed. R. Civ. P. 56(c); <u>see also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  Under
10  summary judgment practice, the moving party bears the initial responsibility of presenting
11  the basis for its motion and identifying those portions of the record, together with affidavits,
12  which it believes demonstrate the absence of a genuine issue of material fact.  <u>Celotex</u>, 477
13  U.S. at 323.

14       If the moving party meets its initial responsibility, the burden then shifts to the
15  opposing party who must demonstrate the existence of a factual dispute and that the fact in
16  contention is material, i.e., a fact that might affect the outcome of the suit under the
17  governing law, <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986), and that the
18  dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for
19  the non-moving party.  <u>Id.</u> at 250; <u>see</u> <u>Triton Energy Corp. v. Square D. Co.</u>, 68 F.3d 1216,
20  1221 (9th Cir. 1995).  Rule 56(e) compels the non-moving party to "set out specific facts
21  showing a genuine issue for trial" and not to "rely merely on allegations or denials in its own
22  pleading."  Fed. R. Civ. P. 56(e); <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>,
23  475 U.S. 574, 586-87 (1986).  The opposing party need not establish a material issue of fact
24  conclusively in its favor; it is sufficient that "the claimed factual dispute be shown to require
25  a jury or judge to resolve the parties' differing versions of the truth at trial."  <u>First Nat'l Bank</u>
26  <u>of Arizona v. Cities Serv. Co.</u>, 391 U.S. 253, 288-89 (1968).  Rule 56(c) mandates the entry
27  of summary judgment against a party who, after adequate time for discovery, fails to make

28

1  a showing sufficient to establish the existence of an element essential to that party's case and

2  on which the party will bear the burden of proof at trial. Celotex, 477 U.S. at 322-23.

3      When considering a summary judgment motion, the court examines the pleadings,

4  depositions, answers to interrogatories, and admissions on file, together with the affidavits,

5  if any. Fed. R. Civ. P. 56(c). The judge's function is not to weigh the evidence and

6  determine the truth, but to determine whether there is a genuine issue for trial. Anderson,

7  477 U.S. at 249. The evidence of the non-movant is "to be believed, and all justifiable

8  inferences are to be drawn in his favor." Id. at 255. But if the evidence of the non-moving

9  party is merely colorable or is not significantly probative, summary judgment may be

10 granted. Id. at 249-50.

11      **2.    Search**

12      Visual body cavity searches of pre-trial detainees may be permissible on less than

13 probable cause because detention facilities are unique places with special security concerns,

14 including smuggling of drugs, money and weapons by concealing them in body cavities.

15 Bell v. Wolfish, 441 U.S. 520, 558-59 (1979). Additionally, although a warrant is generally

16 required for intrusion into the human body, the Supreme Court left open the door to

17 warrantless intrusions where exigent circumstances exist. Schmerber v. California, 384 U.S.

18 757, 770 (1966). In Fuller v. M.G. Jewelry, 950 F.2d 1437, 1448-49 (9th Cir. 1991), the

19 Ninth Circuit held that, at least where there is no evidence suggesting that a body-cavity

20 search was conducted to further jail security, the Schmerber probable-cause requirement

21 governs all searches that invade the body – whether by a needle that punctures the skin or a

22 visual intrusion into a body cavity.

23      In Schmerber, the Court recognized the possible destruction of evidence as an

24 emergency justifying the extraction of a blood sample for testing of a driver's blood-alcohol

25 level. Id. Courts have also recognized exigent circumstances where there is a threat to

26 human life. Brigham City, Utah v. Stuart, 547 U.S. 398, 403 (2006); Martin v. City of

27 Oceanside, 360 F.3d 1078, 1082 (9th Cir. 2004); see United States v. Nelson, 36 F.3d 758

28 (8th Cir. 1994); Fuller, 950 F.2d at 1450 (9th Cir. 1991). An action is reasonable under the

1   Fourth Amendment as long as the circumstances, viewed objectively, justify the action.
2   Brigham City, Utah, 547 U.S. at 404.

3           **3.     State Action**

4           To prove a claim under § 1983, a plaintiff must: (1) "establish a violation of his
5   constitutional rights" and (2) "show that the defendant's actions were taken under color of
6   state law."  Gritchen v. Collier, 254 F.3d 807, 812 (9th Cir. 2001) (citing Flagg Bros., Inc.
7   v. Brooks, 436 U.S. 149, 155-56 (1978)).  "Acting under color of state law is 'a jurisdictional
8   requisite for a § 1983 action.'"  Id. (quoting West v. Atkins, 487 U.S. 42, 46 (1988)).  Private
9   parties generally do not act under color of state law and are properly dismissed from a § 1983
10  action unless the plaintiff establishes by more than conclusory allegations that the private
11  party was somehow a state actor.  Price v. Hawai'i, 939 F.2d 701, 707-08 (9th Cir. 1991).
12  When determining whether a private party acted under color of law, a court starts with the
13  presumption that private conduct does not constitute state action.  Sutton v. Providence St.
14  Joseph Medical Center, 192 F.3d 826, 835 (9th Cir. 1999).  Action by private entities may
15  be state action if there is significant state involvement.  Howerton v. Gabica, 708 F.2d 380,
16  382 (9th Cir.1983).

17          **B.     Parties' Contentions**

18          **1.     Defendants**

19          Tadsen submits her Statement of Facts (Doc. #47, TSOF); the affidavit of Officer
20  Brandon Speier (id., Ex. 1, Speier Aff.); the transcript of the police interview of Plaintiff (id.,
21  Ex. 2, Trans. Police Interview); Plaintiff's deposition (id., Ex. 3, 5 Pl. Dep. (Feb. 7, 2008));
22  Maricopa County Sheriff's Office (MCSO) Policy and Procedure, Intake Process (id., Ex.
23  4, MCSO Policy); and her affidavit (id., Ex. 6, Jesty Aff.).  PMH submits its Statement of
24  Facts (Doc. #49, HSOF); the transcript of the police interview of Plaintiff (id., Exs. 2 and 8,
25  Trans. Police Interview); Plaintiff's deposition (id., Ex. 3, Pl. Dep.( Feb. 7, 2008)); the
26  affidavit of Officer Brandon Speier (id., Ex. 15, Speier Aff.); PMH medical records (id., Ex.
27  4, Med. Records); the affidavit of Nurse Gregory (id., Ex. 16, Gregory Aff.); the affidavit of
28  Tadsen (id., Ex. 5, Jesty Aff.); and the affidavit of Officer Rusk (id., Ex. 7, Rusk Aff.).

1    The Phoenix police arrested Plaintiff on October 5, 2006, on an outstanding warrant

2    and for aggravated assault on a police officer.  (Doc. #47, Ex. Speier Aff. ¶ 4.)  Plaintiff was

3    taken to Paradise Valley Hospital to treat her arm, which she injured as she fled from police.

4    (Id.)  After being treated at Paradise Valley Hospital, Speier transported Plaintiff to police

5    headquarters, where Plaintiff again attempted to escape.  (Id. ¶ 5.)  Speier apprehended

6    Plaintiff just outside of the building and escorted her to an interview room where she was

7    Mirandized and questioned by Detective Strauss about her aggravated assault on police

8    officers. (Id. ¶¶ 5-6.)

9    Speier attests that while Plaintiff was at police headquarters, she repeatedly threatened

10   to commit suicide.  (Id. ¶ 8.)  Plaintiff told Speier that it was her intention to get a gun away

11   from the officers and force the police to shoot her.  (Id.; Ex. 2, Trans. Police Interview).

12   Speier asserts that Plaintiff also told him that when she used the bathroom, she had ingested

13   Valium and she had more Valium concealed in her vagina.  (Speir Aff. ¶ 9.)  During a break

14   in the interview, Plaintiff told Strauss and Speier that she would commit suicide.

15        Det. Strauss: She tried to run from you.
             * * *
16        Rogers: That's Okay. You know what I wanted, and I didn't get it out of
          you.
17
          Officer: She wanted us to kill her.
18
          Det. Strauss: Not going to happen.
19
          Officer: Did you guys find a Derringer anywhere near her? She said that she
20        bought a gun and she was going to point it at us so we would shoot her.

21        Det. Strauss: Why don't you do it yourself.

22        Rogers: I am.

23   (Id., Ex. 2, Trans. Police Interview 55:1-11.)  According to Speier, Plaintiff acted strangely

24   throughout the interview.  (Speier Aff. ¶ 7.)

25        When the interview was over, Speier escorted Plaintiff to the Madison Jail for

26   booking.  At the jail, Plaintiff underwent booking procedures pursuant to jail policy:

27        A Correctional Health Care triage nurse will visually check each prisoner,
          inquire into the state of his health, and then complete a questionnaire in the
28        Pre-Booking System. The Pre-Booking entry will generate an inmate booking
          number and document the prisoner's current health status, including any

1  current medical or mental health needs. Detention personnel observing
2  prisoners with any injury, illness, or extreme intoxication level (alcohol or
   unknown substance) not previously reported shall notify the triage nurse
3  immediately. . . . Prisoners having a medical condition who have not been
   medically approved by the triage nurse will not be accepted. The arresting
4  officer will be referred to another jail with appropriate medical personnel, or
   to a hospital to obtain a medical release.

5  (Id., Ex. 4, MCSO Intake Process Policy.)  Based on Plaintiff's statement that she had taken

6  Valium and had Valium hidden in her vagina, the jail triage nurse did not accept Plaintiff and

7  directed Speier to obtain a medical release from PMH. (Speier Aff. ¶ 11.) Speier transported

8  Plaintiff to PMH to undergo an examination by PMH staff and to receive a medical release.

9  (Id. ¶ 12.) Speier checked Plaintiff into PMH's emergency room at approximately 6:00 a.m.

10  (Id. ¶ 15.)

11  At PMH, Speier informed medical personnel that Plaintiff was suicidal, claimed to

12  have ingested multiple Valium, and claimed that she had concealed drugs in her vagina.

13  (Speier Aff. ¶ 12).  Speier was relieved by Tadsen at approximately 6:30 a.m.  (Speier Aff.

14  ¶ 13; Ex. 6, Jesty Aff. ¶¶ 5, 8.)  Speier informed Tadsen that Plaintiff threatened to commit

15  suicide and claimed to have ingested Valium and to have hidden Valium in her vagina. (Jesty

16  Aff. ¶¶ 6-7.)  Speier also told Tadsen that Plaintiff was to be booked for aggravated assault

17  on a police officer.  (Id. ¶¶ 5, 10.)

18  Nurse Gregory attests that she was on duty in the emergency room when Plaintiff was

19  brought in by the police.  (Doc. #49, Ex. 16, Gregory Aff. ¶ 4.)  The police officer told

20  Gregory that Plaintiff had reported she had ingested or hidden 40 tablets of Valium on her

21  person and it was suspected it was hidden in her vagina.  (Id. ¶ 5.)  Hospital medical

22  personnel concluded that removal of the intra-vaginally concealed Valium was a potentially

23  emergent situation; Gregory attests that drugs and/or contraband are routinely hidden in the

24  vagina and that it is dangerous because drugs may come loose causing an overdose. (Id. ¶¶

25  6-10.) Gregory also attests that, based on her experience, Plaintiff appeared to be under the

26  influence of drugs and that her condition was a medical emergency.  (Id. ¶¶ 11, 12, 14.)

27  PMH records reflect that "removal of vaginal Valium could be considered emergent." (Id.,

28

1   Ex. 4, Med. Rec. at 3.)  At discharge, the record notes "[e]mergency medical condition no
2   longer exists."  (<u>Id.</u>)

3          Medical staff advised Plaintiff that she needed to provide a urine sample.  (Jesty Aff.
4   ¶ 9.)  Tadsen accompanied Plaintiff to the bathroom to get a urine sample from Plaintiff so
5   that the hospital could check on Plaintiff's drug levels; Tadsen was required to be present
6   because Plaintiff was considered a flight risk.  (Jesty Aff. ¶ 10).  Plaintiff did not provide a
7   sample.  (<u>Id.</u> ¶ 11.)  Medical staff advised that they would take the sample themselves;
8   Tadsen escorted Plaintiff to an examination room.  (<u>Id.</u> ¶ 12.)  Plaintiff was wearing a gown
9   and Tadsen attests that she could not see what procedures were performed and that she did
10  not direct the medical staff regarding procedures. (<u>Id.</u>)

11         Plaintiff was examined in a private room.   (Gregory Aff. ¶ 16; Jesty Aff. ¶ 12.)
12  Gregory attests that the ER doctor performed a pelvic examination.  (Gregory Aff. ¶ 18.)
13  Gregory further attests that Plaintiff cooperated with the doctor and that the examination was
14  not done against her will, but that if Plaintiff had resisted or refused the procedure, the
15  procedure would have been required to continue because of the suspected medical
16  emergency.  (<u>Id.</u> ¶¶ 17, 19, 21.)  Plaintiff's urine and blood tested positive for Valium and
17  Methamphetamine.  (<u>Id.</u> ¶ 15; Ex. 4 at 10.)  No drugs were found in her vagina. (<u>Id.</u>)

18         PMH asserts that Plaintiff was a hospital patient, Plaintiff's home address was used
19  for billing purposes, and all instructions, counseling, and treatment were provided to
20  Plaintiff, not to the police officer or for the benefit of the police.  (Ex. 4 at 5 and 8.)

21                          **2.    Plaintiff**

22         In opposition, Plaintiff submits her Statement of Facts (Doc. #63, PSOF); her own
23  declaration (<u>id.</u>, Ex. A, Pl. Decl.); the transcript of the police interview of Plaintiff (<u>id.</u>, Ex.
24  B, Trans. Police Interview); Plaintiff's PMH records (<u>id.</u>, Ex. C); Answer (<u>id.</u>, Ex. D);
25  PMH's Response to Interrogatories (<u>id.</u>, Ex. E, Resp. to Interrogs.); Tadsen's Response to
26  Interrogatories (<u>id.</u>, Ex. G, Resp. to Interrogs.); Tadsen's Supplemental Response to
27  Interrogatories (<u>id.</u>, Ex. G, Supp. Resp. to Interrogs.); and other documents.  In response to
28  PMH's motion, Plaintiff submits many of the same documents as well as Defendants'

1  documents and Plaintiff's Response (Doc. #72); PMH's Answer (Doc. #73, Ex. D); and

2  PMH's Response to Interrogatories (id., Ex. E, Resp. to Interrogs.).

3          Plaintiff disputes that she threatened to commit suicide and asserts that the transcript

4  of the police interview does not show threats of suicide.  (PSOF ¶ 6.)  She denies telling

5  Speier that she intended to get a gun to force the police to shoot her.  (Id. ¶ 7.)  She also

6  denies telling Speier that she had ingested Valium or concealed it in her vagina.  (Id. ¶ 8.)

7  Plaintiff asserts that she did not act strangely during her police interview; rather she was sick

8  to her stomach from stress.  (Id. ¶ 10.)  She asserts that the jail directed Speier to obtain

9  medical clearance that she was not suicidal.  (Id. ¶ 13.)

10          Plaintiff contends that Tadsen relieved Speier at about 6:15 am and that she is unsure

11  of the conversation between Speier and Tadsen.  (Id. ¶ 18.)   Plaintiff also alleges that she

12  walked into PMH on her own – that is, without assistance from the officer or medical  staff

13  – some four hours after police alleged she ingested and hid Valium.  (Id. ¶ 15.)   She argues

14  that medical staff never concluded that the situation was an emergency, especially since her

15  vital signs were all normal, Plaintiff walked into the hospital on her own, and the police did

16  not bring her into the hospital for some four hours after the alleged ingestion of Valium.  (Id.)

17  She also alleges that she did not refuse to provide a urine sample; rather, she was unable to

18  do so because she had had no food or water for nine hours.  (Id. ¶ 21; Doc. #63 at 6.)

19          Plaintiff attests that Tadsen told PMH staff that the vaginally-hidden Valium needed

20  to be removed.  (Id. ¶ 17.)  Plaintiff asserts that medical staff searched her vagina to

21  determine if drugs were present or if she was in danger of overdosing.  (Id. ¶ 22.)  She alleges

22  that she told Tadsen and PMH staff that they needed a warrant to search her intra-vaginally

23  and that Tadsen waived papers around the examination room "to mislead PMH medical staff

24  into thinking [she] may have had a warrant."  (Doc. #63, Ex. A, Pl. Decl. ¶¶ 32-33.)  The

25  procedure was performed by a nurse, not a doctor, and no doctor was in the room.  (Pl. Decl.

26  ¶ 35.)  The procedure lasted about 30 minutes because Plaintiff refused the examination and

27  struggled to stop it.  (Id. ¶ 23.)

28  / / /

1      **3.      Replies**

2          In her Reply, Tadsen argues that she reasonably relied on the information provided

3    to her by Speier and on the judgment of PMH staff that Plaintiff's condition was a potential

4    emergency.  (Doc. #69.)  In the PMH reply, the hospital argues that Plaintiff has not met her

5    burden to show that the pelvic examination became a government search for purposes of

6    establishing that PMH was a state actor.  (Doc. #79 at 3-5.)  It also argues that Plaintiff has

7    proffered no evidence to show that PMH is liable to Plaintiff as a private entity and that, if

8    the Court finds it was a state actor, PMH is entitled to qualified immunity.  (Id. at 5-7.)

9    Finally, it asserts that the treatment falls under the Emergency Aid Exception to the

10   requirement of a search warrant.  (Id. at 7-8.)

11     **C.      Analysis**

12          **1.      Tadsen**

13          **(a)      Constitutional Violation**

14         Tadsen has met her burden to demonstrate there is no material dispute of fact as to the

15   reasonableness of her actions.  Although Plaintiff offers evidence of disputed facts, the Court

16   finds that the disputed facts are not material to Tadsen's liability and do not defeat summary

17   judgment.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 248 (only disputes of fact that

18   might affect the outcome of the suit will preclude the entry of summary judgment).

19         Although Plaintiff denies telling the Phoenix police that she would commit suicide,

20   or that she had ingested Valium, or that she had it hidden somewhere on her body, the

21   transcript of the police interview demonstrates otherwise.  For example, during the interview,

22   Plaintiff said "I wasn't trying to hurt the officer.  I was going to kill myself." (Doc. #49, Ex.

23   8, 3:4-9).  When asked why she wanted to kill herself, Plaintiff responded that she was going

24   to jail for over 50 years.  (Id. 4:7-14.)  Later she stated that she "had some Valium stashed

25   away.  And I took some of those.  And when I got here, I went to the bathroom and pulled

26   them out and took them."  (Id. 5:25-6:10.)  She told police that she took 10 or 12 Valium

27   pills.  (Id. 6:8-9.)  When asked if she had them stashed on her body, she indicated that she

28

1   did, and when asked if they were in her pockets, Plaintiff said "sort of."  She admitted that

2   she had them somewhere else.  (Id. 6:11-16.)

3          In the Ninth Circuit, the general rule is that a party cannot create an issue of fact by

4   contradicting her prior statements.  Kennedy v. Allied Mut. Ins. Co., 952 F.2d 262, 266 (9th

5   Cir. 1991); Radobenko v. Automated Equipment Corp., 520 F.2d 540, 543-44 (9th Cir. 1975)

6   (affirming the grant of summary judgment in an action for breach of fiduciary duty and fraud

7   where the non-moving party claimed in his deposition that he was offered employment,

8   agreed to a leave of absence with pay, and that he quit his job but made completely

9   contradictory statements in his affidavit in opposition to summary judgment).  In Kennedy,

10  the court reasoned that Radobenko was concerned with "sham" testimony that flatly

11  contradicted earlier testimony in an effort to create an issue of fact and avoid summary

12  judgment, and, therefore, in order to discount new evidence, a court must make a factual

13  determination that the contradiction was a "sham."  Kennedy, 952 F.2d at 267.  "Sham"

14  deposition corrections are akin to "sham" affidavits.  Hambelton Bros. Lumber Co. v. Balkin

15  Enterpris., 397 F.3d 1217 (9th Cir. 2005).  In Hambelton, the court upheld the district court's

16  striking of the deposition "corrections" because they were extensive, were made only after

17  the motion for summary judgment, and there were no stated reasons for the changes.  Id. at

18  1225-26.

19         Here, Plaintiff initially told police that she was trying to commit suicide, that she had

20  Valium pills stashed somewhere on her body, but not in her pockets, and that she took some

21  when she used the bathroom.  She contradicts these statements in her sworn declaration

22  submitted in opposition to the motion for summary judgment, but offers no explanation for

23  the contradictions.  The Court finds that this declaration evidence is a sham insofar as

24  Plaintiff claims that she did not tell the police that she wanted to commit suicide or that she

25  had ingested a large quantity of Valium.

26         But even if the Court considered Plaintiff's evidence as to these matters, Tadsen's

27  conduct was reasonable.  Plaintiff offers no evidence to dispute that the jail would not admit

28  her until her medical condition was cleared.  (Doc. #63, PSOF ¶ 13.)  Tadsen and Speier

attest that Speier told Tadsen of the suicide threats, the ingestion of Valium, and the Valium concealed in Plaintiff's vagina.  Plaintiff specifically admits that she has no knowledge of the conversation between the two officers; thus, their evidence is undisputed that Tadsen was so advised.[4]  (Doc. # PSOF 18, 19.)  It appears from the evidence that it was Speier, not Tadsen, who advised PMH of the suicide threat and ingestion and concealment of Valium, although Plaintiff does assert that Tadsen told PMH staff that the intra-vaginally hidden Valium needed to be removed.  Plaintiff additionally alleges that Tadsen stood by and "allowed the exam to proceed."  (Doc. #63 at 6.)

Plaintiff fails to meet her burden to demonstrate a genuine dispute of material fact because, to the extent that Tadsen's conduct was connected to the vaginal cavity search, Tadsen acted reasonably when she relied on the information provided by a police officer, PMH staff concluded there was a medical emergency, and the manner of the search was reasonable.  The evidence shows that Tadsen, who had been told by Speier of the suicide threat and the ingested and hidden drugs, acted reasonably.  Law enforcement officers are generally entitled to rely on information obtained from fellow officers.  Motley v. Parks, 432 F.3d 1072, 1081 (9th Cir. 2005) (finding that officers, who had received information from other law enforcement officers, had probable cause to believe that a parolee resided with a tenant, although he was in fact, in custody).  See United States v. Jensen, 425 F.3d 698, 704 (9th Cir. 2005) (under the "collective knowledge doctrine," an officer can make an arrest at the direction of another law enforcement officer even though the arresting officer himself lacks actual, personal knowledge of the facts supporting probable cause) (citing United States v. Butler, 74 F.3d 916, 921 (9th Cir. 1996), and United States v. Hensley, 469 U.S. 221 (1985)).  Based on her conversation with Speier, Tadsen had probable cause to believe that Plaintiff had ingested drugs and also concealed drugs in her vagina.[5]

_____

[4]Thus, any dispute whether Plaintiff told Speier that she had drugs hidden in her vagina is irrelevant as to Tadsen's liability.

[5]The scope of the vaginal search is not clear from the record; that is, it is not clear if it was a visual inspection, requiring less than probable cause, see Bell, 441 U.S. at 558-59 n.39.  The medical records state "Pelvic–ext. general, vag vault. Scant blood, [no] Valium.

1    Plaintiff argues that there was no medical emergency, but it is not dispositive that the

2    police officers did not recognize or consider the matter an emergency and therefore delayed

3    bringing Plaintiff to a hospital.  Plaintiff relies on United States v. Nelson, 36 F.3d at 761,

4    where the Eighth Circuit rejected the government's exigent-circumstance explanation for a

5    warrantless endoscopy to retrieve a packet of heroin.  That court noted that although doctors

6    were concerned that the packet could rupture or dissipate with time, the evidence showed no

7    immediate threat; in fact, doctors tried to administer laxatives after the initial discovery of

8    the packet and waited over 36 hours to remove it with an endoscopy procedure.  Id.

9    Here the undisputed evidence shows that when presented for booking, the jail nurse

10   refused to admit Plaintiff until she had been cleared by a hospital, Plaintiff was then taken

11   to PMH, and PMH staff considered the matter a medical emergency.  There is no evidence

12   that PMH staff delayed either the vaginal search or the catheter procedure.  Likewise, the

13   nurse attests that, in addition to being advised that Plaintiff had taken drugs and concealed

14   them in her vagina, the nurse believed, based on her observations and medical experience,

15   that Plaintiff was under the influence of drugs.  It is irrelevant that Plaintiff walked into the

16   hospital on her own.  Plaintiff offers nothing but her own conclusory statements that there

17   was no emergency.  This is insufficient to establish lack of a medical emergency justifying

18   the search.  See Hutchinson v. United States, 838 F.2d 390, 393 (9th Cir. 1988) (granting

19   summary judgment against a plaintiff who relied only on her own allegations and conclusory

20   statements that defendants had been medically negligent and who failed to provide affidavits

21   or depositions of medical experts).  In view of Plaintiff's statements to police regarding a

22   desire to commit suicide, the ingestion of a large amount of drugs, and the concealment of

23   drugs, her unsupported claim that there was no medical emergency is not probative.

24   Thus, Tadsen had an objectively reasonable belief that the search was justified, even

25   without a warrant, based on the PMH determination of a medical emergency.  See Martin,

26   360 F.3d at 1082.

27

28   Cervix [illegible] closed [ ] cmt."  (Doc. #49, Ex. 4 at 4.)  The issue is irrelevant, however, because Tadsen had probable cause for the search.

1     Moreover, the evidence demonstrates that the search was conducted in a reasonable

2  manner.  It is undisputed that the examination took place in a private room and that the

3  search was conducted by medical personnel.  Even if the Court assumes that the female nurse

4  conducted the examination rather than a doctor, this is insufficient to render the examination

5  unreasonable.  Plaintiff relies on a Phoenix Police Department Policy not to do a vaginal

6  cavity search without a search warrant: "Physical intrusion will be conducted **by virtue of**

7  **a Search Warrant** or by consent of the suspect and then **_only_** by a Medical Doctor.

8  (*emphasis added*)."  (Doc. #63, PSOF ¶¶ 35-36.)  Although Plaintiff gives several cites to the

9  record regarding this purported policy, she does not provide a copy of the policy nor a cite

10  to the Intake Process Policy and Procedure.  (See Doc. #47, Ex. 4.)  The Court is unable to

11  find the alleged policy in the record.  The closest documents are Tadsen's responses to

12  interrogatories and the policy on strip searches, which makes no mention of a warrant.  (Doc.

13  #63, Ex.. G, Resp. to Interrog. No. 1 and No. 2.)  Regardless, violation of  a local policy is

14  not actionable under § 1983, which does not provide a cause of action for violations of state

15  law or state constitutional rights or local policies.  See Ybarra v. Bastian, 647 F.2d 891, 892

16  (9th Cir. 1981).

17     That Plaintiff struggled and did not want the examination and that she demanded a

18  warrant does not make Tadsen's actions or the search unreasonable.  Tadsen is entitled to

19  summary judgment.[6]

20          **(b)**    **Qualified Immunity**

21     A defendant in a § 1983 action is entitled to qualified immunity from damages for

22  civil liability if her conduct does not violate clearly established statutory or constitutional

23  rights of which a reasonable person would have known.  Harlow v. Fitzgerald, 457 U.S. 800,

24

---

25     [6]The Complaint against Tadsen, unlike the Complaint against PMH, does not refer to

26  the catheter procedure; thus, that procedure is beyond the scope of the Complaint.
Furthermore, there is no evidence that Tadsen's conduct was related in any way to the

27  catheter procedure.  To prevail on a claim under § 1983, plaintiffs must allege that they

28  suffered a specific injury as a result of specific conduct of a defendant and show an
affirmative link between the injury and the conduct of that defendant.  Rizzo v. Goode, 423
U.S. 362, 371-72, 377 (1976).

818 (1982).  In a qualified immunity analysis, the court must make two distinct inquires, the "constitutional inquiry" and the "qualified immunity inquiry."  See Estate of Ford v. Ramirez-Palmer, 301 F.3d 1043, 1049 (9th Cir. 2002).  The "constitutional inquiry" asks whether, when taken in the light most favorable to the non-moving party, the facts alleged show that the official's conduct violated a constitutional right.  Saucier v. Katz, 533 U.S. 194, 201 (2001).  If so, a court turns to the "qualified immunity inquiry" and asks if the right was clearly established at the relevant time.  Id. at 201-02.  This second inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." Id. at 201.  Although the Court has found that Tadsen's conduct did not violate the Constitution, it will nevertheless consider whether Tadsen is entitled to qualified immunity if she did, in fact, violate Plaintiff's rights.

The second step of the Saucier analysis looks at whether the right to conduct a body-cavity search was clearly established law if Tadsen was mistaken about the existence of probable cause and the need for a warrant.  A right is clearly established if its contours are "sufficiently clear that a reasonable official would understand that what he is doing violates that right."  Kennedy v. City of Ridgefield, 439 F.3d 1055, 1065 (9th Cir. 2006) (quoting Hope v. Pelzer, 536 U.S. 730, 739 (2002)).  It is not necessary that there be a prior case with the identical facts showing that a right is clearly established; it is enough that there is pre-existing law that provides a defendant "fair warning" that his conduct was unlawful. Kennedy, 439 F.3d at 1065.  On the other hand, "in the light of pre-existing law the unlawfulness must be apparent."  Anderson v. Creighton, 483 U.S. 635, 640 (1987).

The relevant inquiry in determining whether the right violated was clearly established is whether it would be clear to a reasonable officer that her conduct was unlawful in the situation presented.  Saucier, 533 U.S. at 202.  At the time of the incident, it was established that even if officers are mistaken about probable cause, they are entitled to immunity from liability if their mistake was reasonable.  Fuller, 950 F.2d 1443.  It was also established that law enforcement officers are generally entitled to rely on information obtained from fellow officers.  Motley, 432 F.3d at 1081.

1       Moreover, although a warrant is generally required for all types of searches, as early

2   as 1966, the Supreme Court authorized warrantless searches into the human body where

3   exigent circumstances exist.  <u>Schmerber,</u> 384 U.S. at 770.  In addition, prior the time of the

4   search of Plaintiff in 2006, Courts had recognized exigent circumstances where there is a

5   threat to human life.  <u>Brigham City, Utah</u>, 547 U.S. at 403; <u>Martin</u>, 360 F.3d at 1082.

6       Here, although Plaintiff disputes that she told Speier that she had concealed drugs in

7   her vagina, it is undisputed that Speier told Tadsen that Plaintiff had so advised him.  To the

8   extent that Tadsen set in motion the search, she acted reasonably based on the information

9   from Speier, even if there was no probable cause for the search.  Moreover, PMH staff

10   determined that the vaginally concealed drugs could pose a medical threat to Plaintiff.  To

11   the extent that Tadsen had any control over the search once PMH staff determined there was

12   an emergency, Tadsen acted reasonably in relying on PMH staff for a determination of

13   medical emergency even if there was none.  Finally, the examination was done by a medical

14   professional in a private room in a hospital.  To the extent that Tadsen had any control over

15   the manner of the search, she acted reasonably in determining that the search was conducted

16   in a reasonable manner.

17       Thus, as an alternative ground for summary judgment, Tadsen is entitled to qualified

18   immunity.

19       **2.    PMH**

20       PMH has established that there is no genuine dispute of fact regarding its status as a

21   private entity that is not liable to Plaintiff under § 1983, and Plaintiff has failed to probative

22   offer evidence in dispute.[7]

23       PMH argues that it was not performing a function that is "traditionally the exclusive

24   prerogative of the State," <u>Nat'l Broadcasting Co., Inc. v. Comm. Workers of Am, AFL-CIO</u>,

25   860 F.2d 1022, 1026 (11th Cir. 1988), nor were they engaged in a conspiracy or joint activity

26   with a state actor, <u>Bayou Fleet, Inc. v. Alexdander</u>, 68 F. Supp. 2d 734, 745 (E.D. La. 1999).

27

28       [7]The Ninth Circuit has held that private defendants are not entitled to qualified immunity in § 1983 actions.  <u>Howerton v. Gabica</u>, 708 F.2d 380, 385 n. 10 (9th Cir. 1983).

1   Plaintiff asserts that PMH was acting as the agent of the police, acting under the direction of

2   the police, and that the police continually told PMH that a body cavity search must be done.

3   (Doc. #72 at 6-7.)  Moreover, she asserts that they worked as a team to get Plaintiff onto the

4   examining table and that Tadsen waived papers around in front of PMH medical staff to

5   mislead them into believing it was a warrant.  (Id. at 8; Doc. #63, Pl. Decl ¶ 32-33)

6          When determining whether a private party acted under color of law, a court starts with

7   the presumption that private conduct does not constitute state action.  Sutton, 192 F.3d at

8   835.  Action by private entities may be state action if there is significant state involvement.

9   Howerton, 708 F.2d at 382.  Courts have used four factors or tests to determine when

10  involvement is significant: (1) public function, (2) joint action, (3) government compulsion

11  or coercion, (4) government nexus.  Id. at 383; Sutton, 192 F.3d at 835-36.  Although the

12  factors are helpful, "there is no specific formula for defining state action."  Howerton, 708

13  F.2d at 383 (internal citation omitted).  It is necessary to examine the facts and circumstances

14  of each case.  Id.  The only relevant inquiry here is whether there was joint action.

15         In determining whether police involvement with a private entity was significant,

16  courts have considered such factors as (1) whether the private entity made repeated requests

17  for assistance or the police were summoned on only a single occasion, Howerton, 708 F.2d

18  at 384; Menchaca v. Chrysler Credit Corp., 613 F.2d 507, 513 n.4 (5th Cir. 1980);

19  (2) whether there is evidence that the private entity was influenced by the police attempts to

20  encourage a search, Howerton, 708 F.2d at 384; United States v. Souza, 223 F.3d 1197, 1202

21  (10th Cir. 2000); and (3) whether the private party performing the search intended to assist

22  law enforcement efforts or to further its own ends, id. at 1201; United States v. Lefall, 82

23  F.3d 343, 347 (10th Cir. 1996); United States v. Smythe, 84 F.3d 1240, 1242 (10th Cir.

24  1996).  In Howerton, for example, the Ninth Circuit found that private landlords were state

25  actors where the evidence showed repeated involvement by the police, over a period of at

26  least several days, in an effort to evict the tenant/plaintiffs.  708 F.2d at 381, 384.  In

27  addition, the landlord testified that police presence gave him the feeling that he had the right

28  to cut off the plaintiffs' utilities.  Id. at 384; see Souza, 223 F.3d at 1202 (UPS employee

testified that she was influenced by the police officers' repeated attempts to encourage her to open a package). In <u>Souza</u>, the court found that the search of a package by a UPS employee was a government search not only because the officers targeted the box and twice in five minutes encouraged the employee to open the package, but because there was no evidence that the employee had an independent motivation to open the package. <u>Id.</u>

Here, there is no evidence to suggest that PMH staff knew either Plaintiff or the police officers prior to the time Plaintiff was brought to PMH. <u>See</u> <u>Howerton</u>, 708 F.2d at 384. The undisputed evidence also shows that PMH staff made a determination of a medical emergency. That the determination was made, in part, on the information supplied by the police officers is not enough to convert the private entity into a state actor. The information concerned a medical condition and there is no evidence that it was provided to medical personnel for any reason other than determining Plaintiff's medical status. The evidence shows that police officers brought Plaintiff to PMH to determine whether she was suicidal, suffering from a drug overdose, and had concealed drugs in a body cavity. There is no evidence to suggest that the police were looking for evidence of a crime. <u>See</u> <u>Souza</u>, 223 F.3d at 1202.

Although Plaintiff asserts that PMH "admitted to acting under the direction of the [police]," she offers no evidence of this – only a statement that one of the police officers "request[ed] a vaginal search." (Doc. #73, Ex. E. PMH Respos. to Interrogs. No. 5.) And she offers no evidence that PMH staff believed they were compelled to conduct a search as a result of urging by police, rather than because of Plaintiff's medical condition. <u>See</u> <u>Souza</u>, 223 F.3d at 1202. There is no evidence that PMH had any motivation to conduct the search other than PMH's independent motivation to determine if Plaintiff was suffering from a drug overdose and had concealed drugs in her vagina, both of which posed medical threats to Plaintiff. <u>Id.</u> The undisputed evidence shows that Tadsen was present in the examination room because Plaintiff was a flight risk, having twice attempted to escape from police officers, and there is no allegation that Tadsen assisted in the medical procedures. Plaintiff's claim that Tadsen waived a paper to mislead PMH that she had a warrant undercuts

1  Plaintiff's claim that this was joint activity or a conspiracy between the police and PMH.

2  Action by Tadsen to suggest there was a warrant when none existed would not demonstrate

3  a conspiracy.  And Plaintiff's claim that the hospital was performing a governmental

4  function, a search, ignores the fact that the procedure was medical.  Her claim is also

5  inconsistent with her insistence that the search was improper because it was not performed

6  by a doctor.

7         The cases relied on by Plaintiff are inapplicable to the present facts.  In <u>Dobyns v. E-</u>

8  <u>Systems</u>, 667 F.2d 1219, 1227 (5th Cir. 1982), the court found that a private company

9  contracted to play a dominant management role in a United States field mission was a state

10  actor when it searched employees personal belongings.  Based on contract provisions,

11  especially the right of the government to discipline E-Systems employees, and on the

12  subsequent investigation of the employee by the State Department, the court found an

13  interdependence between the private company and the government – they were joint

14  participants.  <u>Id.</u> at 1227.  In the present case, the hospital was not performing a

15  governmental function, nor was there any contract delegating duties or a continued

16  involvement. <u>New Jersey v. T.L.O.</u>, 469 U.S. 325 (1985), does not address whether a private

17  entity was a state actor; instead, the Court held that the Fourth Amendment applies to

18  searches conducted by public school officials.  In <u>United States v. Doe</u>, 61 F.3d 107, 109 (1st

19  Cir. 1995), the court noted that the Fourth Amendment was implicated in an airport search

20  by non-governmental personnel at security checkpoints because the FAA has extensive

21  administrative directives.  There is no evidence here that there is state regulation of

22  emergency drug testing and body-cavity searches.

23         Likewise, in <u>Souza</u>, 223 F.3d at 1202, the court found that the search of a package by

24  a UPS employee was a government search in large part because there was no evidence that

25  the employee had an independent motivation to open the package. The Court has already

26  found that PMH had an independent motive for performing the medical procedures.  In

27  <u>Abbott v. Latislaw</u>, 164 F.3d 141, 148 (3rd Cir. 1998), the court found state action based on

28  a joint conspiracy where a police officer advised an ex-wife that she had a right to repossess

a car and the officer threatened to arrest the ex-husband if he interfered. Plaintiff's own evidence of Tadsen's allegedly misleading conduct regarding the existence of a warrant conflicts with the notion of a joint conspiracy to conduct a warrantless search, and there is no evidence that the police threatened anyone with arrest regarding the search.

The Court finds that PMH was not a state actor and did not act jointly with or conspire with the police to deprive Plaintiff of her rights. The Court and will grant summary judgment to PMH.

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is withdrawn as to Tadsen's Motion for Summary Judgment (Doc. #46) and Phoenix Memorial Hospital's Motion for Summary Judgment (Doc. #48).

(2) Tadsen's Motion for Summary Judgment (Doc. #46) and Phoenix Memorial Hospital's Motion for Summary Judgment (Doc. #48) are **granted**.

(3) Plaintiff's action is dismissed with prejudice, and the Clerk of Court is directed to enter judgment accordingly.

DATED this 8th day of December, 2008.

_____
David G. Campbell
United States District Judge